**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Southwest Fair Housing Council, | No. CV-19-00178-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| WG Chandler Villas SH LLC, | |
| Defendant. | |

Plaintiff Southwest Fair Housing Council ("Southwest" or "Plaintiff") brought this action pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504" or "the Rehabilitation Act"), the Affordable Care Act ("ACA"), the Fair Housing Act ("FHA") and the Arizona Fair Housing Act ("AZFHA"). Plaintiff filed a Motion for Summary Judgment (Doc. 49), to which Defendant WG Chandler Villas SH, LLC, ("Chandler Villas" or "Defendant") responded in opposition (Doc. 51). Defendant also filed a Motion for Summary Judgment (Doc. 47), to which Plaintiff responded in opposition (Doc. 53). The Motions will be granted in part and denied in part as follows.

I.     **Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Pure questions of law, where there is no disputed issue of fact, are appropriate for summary judgment. *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1110 (9th Cir. 1985). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there

1   can be but one reasonable conclusion as to the verdict." *Id.* (internal citation omitted). In

2   its analysis, the Court must accept the nonmovant's evidence and draw all inferences in

3   the nonmovant's favor. *Id.* at 255. The Court need consider only the cited materials, but it

4   may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

5   **II.   Factual Background**

6       Plaintiff Southwest Fair Housing Council brought this action against Defendant

7   WG Campana, alleging unlawful discrimination on the basis of disability. (Doc. 49 at 9.)

8   Plaintiff is a non-profit organization based in Tucson, Arizona that seeks to ensure that all

9   people, including deaf individuals, have equal access to housing in Arizona. (*Id.*) Plaintiff

10  employed testers to investigate Defendant's willingness to provide auxiliary aids and

11  services at its facilities, including American Sign Language ("ASL")[1] interpreters, as part

12  of its mission to alleviate disability discrimination in housing. (*Id.*)

13      Defendant Chandler Villas is a 164-unit residential apartment complex located in

14  Chandler, Arizona, that provides private apartments for active seniors. (Doc. 47 at 2.)

15  Chandler Villas provides specific amenities to its residents, the cost of which is included

16  in rent, such as housekeeping, common dining experiences, and 24-hour staffing. (*Id.*) As

17  a "supervisory care" community, Chandler Villas provides residents with limited

18  services, which do not include health care, medical care, or complex services. (*Id.* at 2,

19  10-11, 15.) Chandler Villas does offer a medication management program which involves

20  staff reminding a resident when to take a medication and observing the resident take the

21  medication. (*Id.* at 2-3.) None of Chandler Villas' services involve direct physical contact

22  between staff and residents. (*Id.*) Defendant states that all apartments and services at

23  Chandler Villas are strictly private pay and the facility does not accept or receive any

24  Medicare or Medicaid reimbursement for the apartments or services provided. (*Id.*) The

25  community is intended for, and serves, those who are looking to live "independently"

26  without having to cook or clean. (*Id.*) Chandler Villas staff members conduct "safety

27

28  [1] ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. (Doc. 49 at 9 n.2); *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1106 (9th Cir. 2010).

checks" on residents. (Doc. 49 at 14; Doc. 50 ¶ 6.) The safety checks ensure that a resident is present and safe at the facility and include, for example, checking to make sure that a resident has not fallen in his apartment. (Doc. 50 ¶¶ 7, 8.)

On August 23, 2016, Southwest tester Gladys Beebe ("Beebe") visited Defendant's assisted living facility on behalf of her deaf grandfather, Frank, who was a fictional character created for testing purposes. (Doc. 47 at 2.) Each contact or communication between Plaintiff's testers and Defendant's employees that is at issue in this lawsuit was audio recorded. (*See* Doc. 48 ¶¶ 46, 54.) The facts and circumstances of Plaintiff's tester's contacts with Defendants' employee are set forth below.

During Beebe's August 23, 2016 tour with Defendant's Executive Director Kim Woda ("Woda"), Beebe discussed details about her grandfather, including that he was deaf and used ASL to communicate, that he had been living alone in Florida for years and was contemplating relocating to Arizona, that he was "pretty active," and that he took heart medication one time per day. (Doc. 47 at 2-3.) Beebe indicated that her communications with her grandfather were primarily limited to written communications such as sending cards. (Doc. 48 ¶ 58.)

During the tour, Beebe asked Woda what accommodations Defendant would provide regarding vital communications with her deaf grandfather, including medicine-related conversations. (Doc. 49 at 9.) Woda responded that staff would likely use "pen and paper" to communicate with him because no staff member had sign language abilities. (*Id*. at 9-10.) Beebe asked if there would be any issue with Frank being deaf and participating in the medication program, and whether staff would be able to "converse, write, whatever?" (Doc. 47 at 3.) Woda stated she did not believe it would be a problem and told Beebe that communication between Chandler Villas' staff and Beebe's grandfather would be "something that we're going to have to figure out together . . . Frank and all of us." (Doc. 48 ¶ 70.) Woda further stated that they would find Frank's "comfort zone" for communication. (*Id*.) Woda expressed a willingness to meet with Frank to assess his needs and whether Chandler Villas would be a good fit. (Doc. 48 ¶

68.) Woda stated that she had used lip-reading in the past to communicate with deaf individuals. (Doc. 49 at 13.)

During the August 23, 2016 tour, Woda told Beebe that Chandler Villas staff would knock on a deaf resident's door to conduct a safety check. (Doc. 50 ¶ 18.) Additionally, Woda stated that Frank would have to pay for and install his own auxiliary device, a doorbell with a flashing light, to know when someone was present at his door. (*Id*. ¶ 17.) Woda further stated that a special phone could be installed so that staff could check on him if he did not come down for a meal, and that all residents have a life alert button they can use in case of an emergency. (Doc. 48 ¶ 66.)

## III.   Discussion

Defendant moves for summary judgment on three grounds. (Doc. 47.) First, Defendant argues that Plaintiff sustained no injury in fact and thus lacks standing to bring its claims. (*Id*. at 5.) Second, Defendant argues that it receives no federal funding, and thus is not covered by the Rehabilitation Act or the ACA. (*Id*. at 7.) Third, Defendant argues that Plaintiff has provided insufficient evidence of discrimination under the FHA, the ADA, the Rehabilitation Act, and the ACA. (*Id*. at 8.) In support of its final argument, Defendant argues that (1) Beebe never requested an ASL interpreter for her grandfather and Defendant never refused to provide one; (2) the evidence shows that no interpreter was necessary to achieve effective communication for Chandler Villa residents; (3) Defendant satisfied its duty to provide reasonable accommodations by requesting to meet with Frank and stating that it would work with him to determine how to meet his needs; (4) under the circumstances present here, Defendant satisfied its duty to provide reasonable accommodations by offering written notes as a means of communication. (*Id*. at 8-14.)

Plaintiff separately moves for summary judgment on each of its four claims. (Doc. 49.) Plaintiff argues that the Court should grant summary judgment on its ADA claim because Defendant failed to make reasonable and necessary modifications or accommodations that would have provided Plaintiff equal accessibility to Defendant's

facility and services. (*Id*. at 12.) Plaintiff argues that Defendant failed to offer a reasonable accommodation by (1) offering only note writing as a means of communication while failing to assess the deaf individual's literacy level and (2) requiring the potential deaf resident to pay for and install his own reasonable accommodation of a doorbell with lights. (*Id*. at 12-15.) Plaintiff argues that Defendant has not shown that an undue burden would prevent it from providing the requested reasonable accommodation. (*Id*. at 15-16.) Plaintiff further argues that Defendant failed to train its staff on how to reasonably accommodate individuals with disabilities. (*Id*. at 16-17.)

Plaintiff makes analogous arguments with respect to its ACA and Rehabilitation Act claims, arguing that Defendant failed to fulfill the requirement of gathering sufficient information from the disabled individual to determine what accommodations are necessary. (*Id*. at 18-20.) Finally, Plaintiff argues that the Court should grant summary judgment on its FHA and AZFHA claims because Plaintiff has shown that (1) a doorbell with lights and an ASL interpreter are reasonable and necessary accommodations and (2) Defendant failed to engage in the required interactive process to assess the deaf individual's communication needs. (*Id*. at 22-25.)

### A.   Standing

Defendant Chandler Villas moves for summary judgment based upon Plaintiff Southwest's alleged lack of organizational standing to bring its claims. (Doc. 47 at 5.) Defendant argues that, although Plaintiff asserts it "expended significant staff time and other resources to investigate and respond to [Chandler Villas'] discriminatory practices, which diverted resources away from other [] activities," the only resources Plaintiff actually spent were the resources it associates with Chandler Villas' portion of its 2016 testing. (*Id*. at 6.) Defendant argues that these resources were expended in Plaintiff's normal course of business, which includes compliance testing, and were not expended "as any part of a campaign to combat the challenged conduct [of not providing an ASL interpreter]." (*Id*.) Defendant further argues that, following the 2016 test of its facility,

Plaintiff created no educational programs or materials, conducted no awareness campaigns, expended no funds for such activities, and took no action to address the alleged discriminatory conduct beyond the filing of this lawsuit. (*Id*. at 6-7.)

Plaintiff argues that it satisfies the Article III injury requirements because it can demonstrate both frustration of its organizational mission and diversion of its resources to combat the particular housing discrimination in question. (Doc. 53 at 9.)[2]

Fair housing organizations such as Plaintiff have standing to bring civil lawsuits for discrimination uncovered by their testers. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-4 (1982). To demonstrate standing under Article III, an organizational plaintiff must suffer an "injury in fact," which can consist of a tester suffering the harm intended to be prevented by an anti-discrimination statute. *See id*. at 373-5.

Where an organization's resources are diverted to "investigating and other efforts to counteract discrimination," the injury is sufficient to establish standing. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). An organization must show that it suffered a "concrete and demonstrable injury to [its] activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp*. at 379. However, "litigation expenses alone do not establish standing." *Fair Hous. of Marin* at 905. The Ninth Circuit has recently clarified that an organization may not simply go about its "business as usual" but must "alter its resource allocation to combat the challenged practices." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). Examples of alterations to resource allocation that courts have found adequate to establish standing include: creating educational and outreach initiatives, expending resources to address the alleged violation that would have otherwise gone toward some other aspect of the organization's purpose, and monitoring the alleged violations and educating the public about them. *See id*. at 1154-55; *see also Fair Hous. of*

---

[2] Defendant contests only Plaintiff's satisfaction of the "diversion of resources" requirement (Doc. 47 at 5-7); therefore, the Court will focus its standing analysis on that issue.

*Marin* at 904 (listing cases where organizations had standing to bring discrimination claims due to diversion of resources); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 (9th Cir. 2001) (diversion of staff time is a loss for which a fair housing organizational plaintiff may recover damages).

Plaintiff claims that its damages related to diversion of resources amount to $3,428.00 and damages related to frustration of mission amount to $520,000. (Doc. 50 ¶¶ 31-32.) Plaintiff's documentation of its expenses in connection with this action reflects Plaintiff's activities related to its investigation of Chandler Villas as well as at least two other housing facilities. (*See* Doc. 50-1, Exh. A to PSOF.) Plaintiff argues that it diverted resources to address the alleged discriminatory conduct by: (1) training its testers, paying its testers for conducting the tests, and paying for costs related to the tests, such as travel expenses; (2) diverting staff time from other projects; (3) reallocating grant money to fund its investigation of Defendant; and (4) undertaking post-investigation outreach and education efforts, including a newsletter, to inform the deaf community and other stakeholders of their rights. (Doc. 53 at 10; Doc. 54 ¶¶ 86-90.)

Plaintiff cites the deposition testimony of its employees Erika Hardwick ("Hardwick") and John Young ("Young") to support its arguments regarding diversion of resources. (Doc. 54 ¶¶ 86-90.) Specifically, Hardwick testified at her deposition that she had to begin billing her work regarding Southwest's testing and investigation of Defendant's alleged discrimination to a specific grant, rather than attributing it to a general funding source, because she was "expending so much time and energy doing it" that she "wasn't doing [her] other stuff." (Doc. 54-3 at 10-14.) Ms. Hardwick further testified that, due to the time she spent investigating Defendant and responding to the violations alleged in this action, she was unable to spend as much time as she otherwise would have on a project to undertake investigation of discriminatory practices in Arizona mobile home parks. (*Id*. at 14-15.)

In response to a question about whether Plaintiff diverted funds from another program to address the issues raised in this case, Young testified that "when something

like this comes up . . . it requires us to refocus our efforts . . . to address that particular issue, as opposed to other issues that we may have identified . . . . [I]t does take resources away from other activities and other issues that we had planned on dealing with." (Doc. 54-5 at 10-11.) Young further testified that he directed the staff members responsible for conducting Southwest's education and outreach programs to "figure out how to best provide education and outreach to the population that is identified in the claim" and "that's what they did." (*Id*. at 11.) Young further testified that the "resources that [Plaintiff] used to deal with this particular issue were resources that would have been used to deal with other fair housing issues that we had discovered or were aware of, or . . . wanted to investigate or look into . . . [T]his investigation and all of the things have gone into it have been a pretty dramatic diversion of our resources in a way that has really required staff to refocus and do things that they weren't anticipating." (*Id*. at 12.)

The deposition testimony of Hardwick and Young establishes that Plaintiff diverted resources, including staff time and organizational funding, to address Defendant's alleged discriminatory practices. This testimony is sufficient to establish "diversion of resources" for the purpose of organizational standing. Accordingly, Defendant's Motion for Summary Judgment will be denied on the issue of standing, and Plaintiff's Motion will be granted on that issue.

### B.      Rehabilitation Act and ACA Claims

In support of its Motion for Summary Judgment on the Rehabilitation Act and ACA claims, Defendant argues that it does not receive federal financial assistance and that Plaintiff has failed to establish the federal funding nexus required to establish Defendant's liability pursuant to Section 504 of the Rehabilitation Act and the ACA. (Doc. 47 at 7.)

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The

statute defines "program or activity," in relevant part, as "all of the operations of" "an entire corporation . . . or other private organization . . . (i) if assistance is extended to such corporation [or] private organization [] as a whole; or (ii) which is principally engaged in the business of providing [] health care, housing, [or] social services[.]"  29 U.S.C. § 794(b)(3).

The ACA provides that "an individual shall not, on the ground prohibited by . . . section 794 of Title 29 [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116. "[P]ayments that include a subsidy constitute 'Federal financial assistance' within the meaning of the Rehabilitation Act." *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984).

The scope of Section 504 is limited to those who "actually receive federal financial assistance." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). Congress intended that a program or operation may avoid the non-discrimination requirements of the Rehabilitation Act (or other federal anti-discrimination statutes) by opting out of receiving federal funding. *Id.* at 505-6. Entities that merely benefit from federal funding, without actually receiving it, are not subject to the Rehabilitation Act. *Id.* at 606-7; *see also Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908-9 (9th Cir. 2013). However, there is no statutory basis for a distinction between direct and indirect aid; in other words, institutions that themselves have not applied for or directly received federal funding may still be subject to non-discrimination requirements if they receive federal funds from an intermediary or third party. *See Grove City College v. Bell*, 465 U.S. 555, 563-63 (1984) (college that received federal funds from individual students was considered a recipient of federal funding although it did not directly receive federal financial assistance). Thus, a hospital's receipt of Medicare and Medicaid funds from patients can subject the hospital to Section 504 of the Rehabilitation Act. *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1042-43 (5th Cir. 1984).

1    Plaintiff alleges in its First Amended Complaint ("FAC") that Defendant qualifies

2    as "a program or activity" receiving federal financial assistance pursuant to 29 U.S.C. §

3    794(b) because Defendant receives funding from Medicare and/or Medicaid; the FAC

4    does not allege that Defendant receives federal funding in the form of veterans' pensions

5    or benefits. (Doc. 2 ¶¶ 15, 95; *see also* Doc. 47 at 7.) Defendant has presented evidence

6    showing that it does not receive funding from Medicare and/or Medicaid. (*See* Doc. 51 at

7    4; Doc. 48-2 at 3, 10). Plaintiff has not provided any controverting evidence. Therefore,

8    the Court concludes that there is no evidence to support a finding that Defendant receives

9    federal funding in the form of Medicare and/or Medicaid.

10    In its summary judgment briefing, Plaintiff relies on the contents of an

11    informational pamphlet and a public website to argue that Defendant, through its parent

12    company Atria Senior Living ("Atria"), is a recipient of federal funding via the Veterans

13    Affairs Aid and Attendance Pension. (Doc. 53 at 11-12.) According to Atria's website,

14    "many" of its residents are "using this pension" to pay for services in Atria communities.

15    (*Id.*)[3] The Court assumes, without deciding, that Atria's receipt of federal funding in the

16    form of payments from veterans' benefits programs is sufficient to establish a federal

17    funding nexus on behalf of Chandler Villas. *See Bonner v. Arizona Dep't of Corr.*, 714 F.

18    Supp. 420, 422-23 (D. Ariz. 1989); 29 U.S.C. § 794(b)(3). The Court further finds that

19    Plaintiff has presented some evidence of Atria's, and thus Chandler Villas', receipt of

20    federal funding in the form of veterans' benefits. But Plaintiff's FAC does not allege that

21    Defendant receives federal funding in the form of veterans' pensions or benefits. (*See*

22    Doc. 2; *see also* Doc. 47 at 7.) Accordingly, an issue remains as to whether Plaintiff

23    timely disclosed its theory of Defendant's federal financial assistance and, if it did not,

24    whether it may do so now

25    Defendant argues that Plaintiff failed to fulfill its obligation to disclose its federal

26    funding legal theory and the evidence supporting it prior to the close of discovery, and

27

28    _____

[3]    *See also* Atria Senior Living, Veterans Benefits,
https://www.atriaseniorliving.com/family-resources/financial-planning/veterans-benefits/
(accessed Feb. 26, 2020).

that its failure to do so bars it from raising the theory or evidence at the summary judgment stage. (Doc. 51 at 3-5; Doc. 52 ¶ 30.) Defendant states that discovery closed on February 28, 2020 and that "neither Plaintiff's responses to MIDP, last supplemented on February 28, 2020, nor its discovery responses served prior to the close of discovery, make any reference to the [Department of Veterans Affairs] or any pension plan, or Chandler Villas' alleged receipt of [Department of Veterans Affairs] funds, or any theory related to such." (Doc. 52 ¶ 30; *see also* Doc. 52-2.) Defendant contends that Plaintiff did not disclose the theory that Defendant receives federal funds in the form of veterans' pensions or benefits from the Department of Veterans Affairs ("VA") until March 5, 2020, a week after discovery closed. (Doc. 52 ¶ 30; *see also* Doc. 52-2 at 24.)

In response, Plaintiff contends that its allegation in the FAC that Defendant received federal funds in the form of Medicare and/or Medicaid was sufficient to timely raise the theory that Defendant receives federal funds from veterans' pensions and/or benefits. (Doc. 57 at 9-10.) Plaintiff further contends that since Defendant already knew that it received federal funds in the form of VA pension benefits, Defendant cannot show prejudice even though the specific information pertaining to the VA benefits was disclosed approximately five days after the close of discovery. (*Id.*)

The parties in this case were required to comply with the Mandatory Initial Discovery Pilot Project ("MIDP"), which required them, inter alia, to state facts relevant to and legal theories supporting each claim or defense during discovery. *See* General Order 17-08, Section B(4). Likewise, the Federal Rules of Civil Procedure require a party to disclose witnesses, documents, and other sources of information that may support a claim or defense. *See* Fed. R. Civ. P. 26(a)(1).

Allowing a plaintiff to proceed with a new theory of recovery after the close of discovery prejudices a defendant and is not permitted because a "lack of notice" on an "issue central to the cause of action makes it difficult, if not impossible, for [a defendant] to know how to defend itself." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). "A complaint guides the parties' discovery, putting the defendant on notice of

the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Id.* "A defendant suffers prejudice if a plaintiff is allowed to proceed with a new theory of recovery after close of discovery." *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 951–52 (9th Cir. 2018) (internal citation omitted). "It is well settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage." *Bullard v. Wastequip Mfg. Co. LLC*, 2015 WL 12766467 at *10 (C.D. Cal. April 14, 2015); *see also Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.") A plaintiff "can avoid this bar by showing that defendants had sufficient notice of [the legal theory] prior to the close of discovery, either through the pleadings or otherwise, or by demonstrating that the court should allow an amendment of the complaint to permit him to assert the new theory at the summary judgment stage." *Bullard*, 2015 WL 12766467 at *10 (citing *Coleman*, 232 F.3d at 1291).

Plaintiff's argument amounts to an assertion that its allegation that Defendant received VA funding is not a new theory of recovery because the FAC alleges that Defendant receives federal funds and therefore Defendant had notice of the theory. (Doc. 57 at 9-10.) Plaintiff also argues that Defendant has suffered no prejudice. (*Id.*) Beyond Plaintiff's conclusory assertion that it raised the issue in the FAC and its unsupported argument that Defendant should have already been aware of the theory despite its non-disclosure, Plaintiff does not explain why the alleged VA funding is not a new theory of recovery. The FAC indisputably fails to allege that Defendant or Atria receives VA funding, and Plaintiff's late disclosure of this theory violates the MIDP Rules and Fed. R. Civ. P. 26(a)(1). Receipt of federal funds is an essential element of a defendant's liability pursuant to the Rehabilitation Act and the ACA. Discovery on the issue would have permitted both parties an opportunity to obtain the evidence needed to prove, or disprove, this element at trial. Like the defendants in *Coleman*, due to Plaintiff's failure to disclose

1    this theory before the close of discovery, Defendant had no opportunity to prepare a

2    defense to the allegation that it receives federal financial assistance in the form of VA

3    funds. The late disclosure of this theory of recovery is prejudicial. *See Smith*, 887 F.3d at

4    951–52. Therefore, Plaintiff cannot proceed with this theory.

5        Because Plaintiff is precluded from pursuing its theory that Defendant received

6    federal financial assistance in the form of veterans' benefits and Plaintiff has failed to

7    identify any other evidence of Defendant's receipt of federal funding, summary judgment

8    on the Rehabilitation Act and ACA claims will be granted to Defendant.

9        **C.    ADA Claims**

10       The FAC alleges that Defendant discriminated on the basis of disability in

11   violation of Title III of the ADA, 42 U.S.C. § 12181, by denying effective

12   communication, full and equal enjoyment, and a meaningful opportunity to participate in

13   and benefit from Defendant's residential and health care services. (Doc. 2 at ¶¶ 105-116.)

14   These allegations stem from Plaintiff's testing of Defendant's facility using a fictional

15   deaf relative, which Plaintiff argues resulted in a refusal by Defendant to provide a

16   reasonable accommodation to ensure effective communication by requiring the deaf

17   relative to install his own doorbell with a flashing light in order to know when someone

18   was present at his door and by refusing to provide an ASL interpreter. (Doc. 49 at 9-10.)

19       **1.    Applicable Law**

20       Title III of the ADA prohibits discrimination based on disability by places of

21   public accommodation. 42 U.S.C. § 12182(a). Specifically, Title III provides that "No

22   individual shall be discriminated against on the basis of disability in the full and equal

23   enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of

24   any place of public accommodation by any person who owns, leases (or leases to), or

25   operates a place of public accommodation." *Id*. Title III further provides that "[i]t shall be

26   discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges,

27   advantages, accommodations, or other opportunities to an individual or entity because of

28   the known disability of an individual with whom the individual or entity is known to have

a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Title III defines discrimination as the failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii); *Martin v. PGA Tour*, 532 U.S. 661 (2001).

To prevail on an ADA claim, a plaintiff must show: (1) he or she is a disabled individual under the statute; (2) the defendant is a place of public accommodation; and (3) the defendant discriminated against the plaintiff by denying a full and equal opportunity to enjoy the services the defendant provides. *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 670 (9th Cir. 2010). To establish the final element, a plaintiff must further show that "accommodation of the handicap may be necessary to afford the [disabled] person an equal opportunity to use and enjoy the dwelling," that the accommodation is "reasonable," and that the defendant "refused to make the requested accommodation." *See Dubois v. Ass'n of Apt. Owners*, 453 F.3d 1175, 1179 (9th Cir. 2006).

The Department of Justice ("DOJ") has issued implementing regulations for Title III of the ADA as well as Technical Assistance ("TA") Manuals.[4] *See* 28 C.F.R. 36.101 *et seq.* The regulations provide that a public entity "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). The regulations further provide that a public entity "shall take those steps that may be necessary to ensure that no individual with a disability

---

[4] An agency's interpretation of its own regulations is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citation omitted). Thus, "[t]he [Department of Justice's] interpretation of its ADA implementing regulations is entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir. 2014) (internal citation and quotation omitted). "The [TA] Manual is such an interpretation, and, as such, is entitled to significant weight as to the meaning of the regulations." *Id.* (internal citation and quotation omitted).

is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 28 C.F.R. § 36.303(a).

The regulations state that "a public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). "A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her." 28 C.F.R. § 36.303(c)(2). "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). The DOJ has explained that the exchange of written notes is not appropriate "when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home or elsewhere." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 837 n.8 (11th Cir. 2017) (citing 28 C.F.R. pt. 36 App'x A).

"A categorical refusal to provide ASL interpreters to deaf residents fails to make a reasonable accommodation" and therefore violates the ADA.[5] *Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC*, No. 15CV6336RJDLB, 2017 WL 4297237, at *4 (E.D.N.Y. Sept. 26, 2017). "An outright refusal to provide an interpreter, as a matter of policy, demonstrates an unwillingness to engage with the needs of deaf persons." *Id.* However, there is no bright-line rule as to when an interpreter is necessary for effective

---

[5]Although this finding was made in the context of a Rehabilitation Act claim, "[t]he standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (internal citations omitted); *see also Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018) (case law interpreting the ADA and the Rehabilitation Act is generally used interchangeably).

communication or when, instead, "oral communication plus gestures and visual aids or note writing will achieve effective communication." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1087 (11th Cir. 2007). The standard to be applied is one of "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (interpreting the Rehabilitation Act to require "meaningful access" in the form of "reasonable accommodation" when necessary).

An entity violates the ADA when it fails to provide a reasonable accommodation unless the entity can demonstrate that such accommodation would create an undue burden or fundamentally alter the nature of the service being offered. 42 U.S.C. § 12182(b)(2)(A)(iii). An "undue burden" is defined as "significant difficulty or expense." 28 C.F.R. § 36.104. The ADA requires that reasonable accommodations be provided and paid for by the public accommodation unless providing them would be an undue financial and administrative burden or a fundamental alteration of the program. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001).

## 2.     Analysis

Both parties move for summary judgment on the ADA claim. Plaintiff argues that the Court should grant summary judgment on its ADA claim because it has shown that (1) Defendant is a place of public accommodation, and thus subject to the ADA's requirements; (2) Defendant failed to offer reasonable accommodations to deaf persons; (3) Defendant's offer of note-writing as a means of communication was not sufficient to comply with the ADA; and (4) Defendant required a deaf person to fund and install his own reasonable accommodation in the form of a doorbell with lights. (Doc. 49 at 3-8.)

Defendant does not dispute that it is a place of public accommodation. (*See* Docs. 47, 51.) Nor does Defendant dispute that deafness is considered a disability within the meaning of the ADA. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) ("There is no dispute that the class members, who are hearing impaired, are disabled."); *Duffy v. Riveland*, 98 F.3d 447, 454-5 (9th Cir. 1996) (deaf inmate considered "handicapped" within meaning of ADA). As discussed in Section II, Plaintiff

1  has established the elements necessary for standing. The issues before the Court center on

2  whether there are genuinely disputed facts as to whether Defendant denied Plaintiff, via

3  its tester, a full and equal opportunity to enjoy Defendant's services by requiring a deaf

4  individual to install his own doorbell with lights and by refusing to provide an ASL

5  interpreter.

6      Defendant argues that the Court should grant it summary judgment on the ADA

7  claim because the evidence, in the form of communications that took place during the

8  tour of the Chandler Villas facility, does not show that discrimination occurred. (Doc. 47

9  at 8-14.) Defendant argues that it complied with the requirement to afford reasonable and

10  effective accommodations to deaf persons because it engaged in a willingness to work

11  with Frank to determine his communication needs and did not deny him an ASL

12  interpreter. (*Id.*)

13          **a.     ASL Interpreter**

14      The facts and evidence show that, as a matter of law, Defendant did not violate the

15  ADA with respect to an ASL interpreter. The transcript of the conversation between

16  Beebe and Woda shows that Beebe never requested an ASL interpreter for her

17  grandfather. Beebe never indicated that "pen and paper" or written notes would be an

18  ineffective form of communication with her deaf grandfather. To the contrary, Beebe

19  indicated that she communicated with her grandfather via written communication in the

20  form of cards. Based on that information, it was reasonable for Defendant to proceed on

21  the assumption that the grandfather had a sufficient literacy level to communicate in

22  writing about basic information.

23      Furthermore, the evidence indicates that Defendant does not provide any complex

24  services that might require the use of an ASL interpreter. Defendant's provision of

25  medical care is limited to its medication management program, which involves staff

26  reminding a resident when to take a medication and observing the resident take the

27  medication. There is no evidence in the record whatsoever that Defendant's staff

28  members engage in discussions with residents involving the details or nature of their

1   medical care, or any other potentially complex matters. All of the evidence in the record

2   indicates that communications between staff and residents would be limited to providing

3   basic necessities such as food, cleaning, and transportation. Thus, Plaintiff has provided

4   no evidence to show that written notes would be an ineffective form of communication.

5     Finally, the evidence shows that Defendant was willing to engage in further

6   discussions with the grandfather regarding his "comfort level" of communication. Woda

7   stated multiple times during the conversation that she wanted to work with Beebe and her

8   grandfather to determine whether Chandler Villas would be a good fit and what

9   accommodations might be necessary. There is no evidence showing that Defendant

10  categorically denied Plaintiff an ASL interpreter. While Woda did offer only note-writing

11  as a means of communication, such an offer, in conjunction with all of the other evidence

12  in this case, is insufficient to create a question of fact as to whether Defendant violated

13  the ADA with respect to an ASL interpreter. Thus, Plaintiff's motion for summary

14  judgment will be denied on this issue, and Defendant's motion will be granted.

15        **b. Doorbell**

16    In response to Plaintiff's Motion for Summary Judgment on this issue,[6] Defendant

17  contends that the ADA does not require it "to install, at its expense, a special doorbell in

18  a private apartment to alert a deaf resident of the presence of a visitor." (Doc. 51 at 10.)

19  Defendant contends that its obligation was "to allow a resident to install such

20  modification—which it clearly communicated it would do." (*Id.* (citing 24 C.F.R.

21  100.203 ("it shall be unlawful for any person to refuse to permit, at the expense of a

22  handicapped person, reasonable modification of existing premises, occupied or to be

23  occupied by a handicapped person, if the proposed modification may be necessary to

24  afford the handicapped person full enjoyment of the premises of a dwelling."))).[7]

25  ---

    [6] Defendant's Motion for Summary Judgment acknowledges that Woda stated that Frank
26  would need to pay for and install his own doorbell with lights and does not argue that her
    statement complies with the ADA's reasonable accommodation provisions. (Doc. 47 at 8-
27  14.)
    [7] Defendant appears to rely on the argument that a flashing doorbell is merely a
28  modification and does not rise to the level of an accommodation that is necessary to
    afford a disabled individual equal access to its goods and services. *See* H.R. REP. 100-
    711 at 25 (discussing a flashing doorbell as a modification that a landlord would be

1    Defendant further contends that Plaintiff did not timely raise the doorbell theory of

2    liability. (Doc. 51 at 3.) Specifically, Defendant contends that the FAC alleges only that

3    Chandler Villas violated the ADA by denying or refusing to provide an ASL interpreter

4    for a deaf individual. (*Id.* at 2-3.) Defendant argues that because the doorbell theory of

5    liability was raised for the first time at the summary judgment stage and was not

6    disclosed in the FAC or at any time prior to summary judgment, Plaintiff should be

7    barred from raising the theory now. (*Id.* at 3.)

8    In reply, Plaintiff argues that it timely disclosed the doorbell theory of liability.

9    (Doc. 57 at 8.) Plaintiff further argues that a flashing doorbell is a reasonable

10   accommodation under the ADA and that, pursuant to Ninth Circuit precedent,

11   antidiscrimination laws "require reasonable accommodations to be provided and paid for

12   by the housing provider unless providing them would be an undue financial and

13   administrative burden or a fundamental alteration of the program." (Doc. 57 at 3.)

14   As an initial matter, the Court finds that the FAC sufficiently raised the doorbell

15   theory of liability such that Defendant was on notice of it prior to summary judgment.

16   The FAC alleges that Plaintiff's tester was "told that a deaf resident should install his

17   own necessary devices, such as a blinking door bell." (Doc. 2 at ¶ 50.)

18   The parties' substantive disagreement appears to center around whether a flashing

19   doorbell is a reasonable modification that would allow a deaf resident "full enjoyment" of

20   the premises, in which case Defendant would simply be required to permit the resident to

21   install it at his own expense, or whether the doorbell is a reasonable accommodation that

22   is necessary to ensure a deaf resident's equal enjoyment of Defendant's goods and

23   services. The Court finds that a flashing doorbell is a reasonable accommodation under

24   the ADA—not merely a modification—in the context of Defendant's housing facility,

25   because one of the services that Defendant provides residents is safety checks. These

26

27   required to permit a tenant to install at his own expense "in order to 'see' that someone is
     ringing the doorbell").

28

- 20 -

safety checks involve a staff member ringing the doorbell of a resident's apartment to ensure that he is safe and, for example, has not fallen. (*See* Doc. 50 ¶¶ 6-8.) In light of the fact that Defendant provides housing to "active seniors," the safety checks are an essential part of the goods and services that Defendant offers. Thus, the doorbell—or an equivalent accommodation—is not merely a feature that would enhance a deaf individual's enjoyment of the premises by, for example, allowing him to see that a visitor has arrived; rather, it is an integral part of the safety check service that Defendant provides. Equal access to this service is necessary for a deaf resident at Defendant's facility to use and enjoy his dwelling. Obviously, a deaf individual is unable to hear a staff member knock on the door or ring a standard doorbell to conduct a safety check.

The ADA requires that reasonable accommodations be provided and paid for by the public accommodation unless providing them would be an undue financial and administrative burden or a fundamental alteration of the program. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). Nothing in any authority that Defendant cites or that the Court has located indicates that a public accommodation would not be required to provide and pay for a reasonable accommodation for a disabled individual, so long as the accommodation is not unduly burdensome. Defendant does not argue that providing a doorbell with lights would unduly burden it (*see* Doc. 47 at 8; Doc. 50), and the evidence in the record does not show that installation of a flashing doorbell would cause an undue financial and administrative burden or a fundamental alteration of Defendant's program.

However, a material issue remains as to whether Defendant offered alternative reasonable accommodations that would allow a deaf individual equal enjoyment of the safety check service. The record shows that Defendant informed Plaintiff's tester that a special phone could be installed to enable staff to check on a deaf individual, and that all residents have a life alert button they can use in case of an emergency. (Doc. 48 ¶ 66.) Because a question of fact exists regarding whether a special phone and life alert button would be sufficient to allow a deaf individual equal enjoyment of the safety check

service, or whether a flashing doorbell is required, summary judgment will be denied to both parties on this issue.

Accordingly, the Motions for Summary Judgment will be granted in part and denied in part as to the ADA claim, with both Motions being denied as to the issue of the flashing doorbell, and Defendant's Motion being granted as to the issue of the ASL interpreter.

## D.     FHA and AZFHA Claims

The requirements of the FHA and the AZFHA are the same. (Doc. 49 at 20, n.10; Doc. 57 at 6, n.11); *see also City of Tempe v. State*, 351 P.3d 367, 371 (Ariz. App. 2015); 42 U.S.C. § 3601 *et seq.*

### 1.     Applicable Law

Under the FHA, unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Ninth Circuit has "repeatedly interpreted this language as imposing an 'affirmative duty' on landlords and public agencies to reasonably accommodate the needs of disabled individuals." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004). This duty includes the responsibility to provide and pay for reasonable accommodations that are not unduly burdensome. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1148-52 (9th Cir. 2003) (internal citations and quotations omitted) ("[T]he history of the FHA clearly establishes that Congress anticipated that landlords would have to shoulder certain costs involved, so long as they are not unduly burdensome."); *see also* H.R. REP. No. 100-711 at 25 ("it [is] illegal to refuse to make reasonable accommodation in rules, policies, practices, or services if necessary to permit a person with [a disability] equal opportunity to use and enjoy a dwelling. The concept of 'reasonable accommodation' has a long history in regulations and case law dealing with discrimination on the basis of [disability].") Courts "often rely on and apply the case law and regulations interpreting the ADA and the Rehabilitation Act in interpreting the

'accommodation' of disabled individuals under the FHA." *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1127, n.3 (C.D. Cal. 2015) (citing *Giebeler*, 343 F.3d at 1149 (courts interpret the FHA's accommodation provisions with the FHA's goal of "protect[ing] the right of handicapped persons to live in the residence of their choice in the community" in mind) (internal citations omitted)).

To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff must prove all of the following elements: "(1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." *See* 42 U.S.C. § 3604(f)(3)(B); *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006) (listing elements required to prevail on FHA claim); *see also United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997) (listing prima facie elements of FHA claim).

Reasonable accommodations on behalf of disabled persons "may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHA requires "reasonable accommodations necessary to meet the disability-created needs of a disabled person, so that the disabled person may enjoy the same [housing] opportunities enjoyed by nondisabled persons." *Giebeler*, 343 F.3d at 1150 (citing *U.S. Airways v. Barnett*, 535 U.S. 391 (2002)). The *Barnett* Court held that reasonable accommodations to achieve equal opportunity may require preferential treatment for disabled persons, because facially neutral policies or practices, even if not invidiously discriminatory, may result in treatment that denies disabled persons equal access and opportunity. *Id.* at 1150. The Seventh Circuit has held that "[w]hether the requested accommodation is necessary requires a "showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by

1   ameliorating the effects of the disability." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838

2   (7th Cir. 2001) (internal citation omitted).

3       "Ordinarily, an accommodation is reasonable under the [FHA] when it imposes no

4   fundamental alteration in the nature of the program or undue financial or administrative

5   burdens." *Giebeler*, 343 F.3d at 1157 (internal citation and quotation omitted). "The

6   question whether a particular accommodation is reasonable 'depends on the individual

7   circumstances of each case' and 'requires a fact-specific, individualized analysis of the

8   disabled individual's circumstances and the accommodations that might allow him to

9   meet the program's standards.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)

10  (citing *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.1999)). The

11  plaintiff bears "the initial burden of producing evidence that a reasonable accommodation

12  was possible." *Id*. Thereafter, the burden shifts to the defendant "to produce rebuttal

13  evidence that the requested accommodation was not reasonable." *Id*.

14      The FHA requires a housing provider to engage in an interactive process with a

15  tenant or resident with a disability. *Montano*, 79 F. Supp. 3d at 1128 ("Defendant's

16  conduct, by failing to engage in the interactive process relating to the nature and scope of

17  plaintiff's requested accommodations, also constitutes a violation of the FHA.") The

18  *Montano* Court cites *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir.

19  1996), *as amended*, for the proposition that a housing provider who fails to engage in an

20  interactive process in order to determine the scope and nature of the requested

21  accommodation violates the FHA. "If a landlord is skeptical of a tenant's alleged

22  disability or the landlord's ability to provide an accommodation, it is incumbent upon the

23  landlord to request documentation or open a dialogue." *Id*.

24                  **2.      Analysis**

25      Both parties move for summary judgment on the FHA claims. Plaintiff argues that

26  the Court should grant it summary judgment on the FHA claims because its requests for

27  an ASL interpreter and a flashing doorbell were both reasonable and necessary, and

28  Defendant failed to engage in an interactive process. (Doc. 49 at 20-25.) Defendant

1 | argues that the Court should grant it summary judgment on the FHA claims for the same
2 | reasons it sought summary judgment on the ADA claim, namely, that Plaintiff has not
3 | provided evidence of disability discrimination. (Doc. 47 at 8-14.)

4 | The issues in contention include whether the requested accommodations of an
5 | ASL interpreter and a flashing doorbell were (1) necessary; (2) reasonable, and (3)
6 | whether Defendant refused to make the requested accommodation. *Dubois*, 453 F.3d at
7 | 1179. Also in dispute is whether Defendant engaged in an interactive process to
8 | determine the scope and nature of the requested accommodations. *Montano*, 79 F. Supp.
9 | 3d at 1128.

10 | **a.      ASL Interpreter**

11 | The facts and evidence show that, as a matter of law, Defendant did not violate the
12 | FHA with respect to an ASL interpreter, because Plaintiff cannot show that Defendant
13 | refused to provide the requested accommodation of an ASL interpreter. As discussed
14 | above in Section C(2)(a), the evidence shows that Beebe never requested an ASL
15 | interpreter for her grandfather, Defendant reasonably proceeded on the assumption that
16 | the grandfather had a sufficient literacy level to communicate in writing about basic
17 | information, and Defendant does not provide any complex services that might require the
18 | use of an ASL interpreter. Plaintiff has provided no evidence to show that written notes
19 | would be an ineffective form of communication under the facts of this case.

20 | Furthermore, even if a question of fact did exist as to whether an ASL interpreter
21 | could be a reasonable and necessary accommodation for the deaf grandfather, Plaintiff
22 | cannot show that Defendant refused to provide an interpreter or failed to engage in an
23 | interactive process regarding the need for an interpreter. To the contrary, the evidence
24 | shows that Defendant was willing to engage in further discussions with the grandfather
25 | regarding his "comfort level" of communication. Woda stated multiple times during the
26 | conversation that she wanted to work with Beebe and her grandfather to determine
27 | whether Chandler Villas would be a good fit and what accommodations might be
28 | necessary. The Court finds this evidence sufficient to satisfy the FHA's interactive

1     process requirement. There is no evidence showing that Defendant refused to provide

2     Plaintiff an ASL interpreter. While Woda did offer only note-writing as a means of

3     communication, such an offer, in conjunction with all of the other evidence in this case, is

4     insufficient to create a question of fact as to whether Defendant violated the FHA with

5     respect to an ASL interpreter. Thus, Plaintiff's motion for summary judgment will be

6     denied on this issue, and Defendant's motion will be granted.

7              **b.**     **Doorbell**

8             In its Motion for Summary Judgment, Plaintiff argues that the flashing doorbell is

9     a "necessary" accommodation because it is essential to the ability of Defendant's staff to

10    perform a safety check for a deaf resident. (Doc. 49 at 22.) Plaintiff further argues that a

11    flashing doorbell is "reasonable" because it imposes no fundamental alteration or undue

12    financial or administrative burdens. (*Id.* at 23.) Plaintiff further argues that Defendant

13    failed to engage in an interactive process by "denying the tester's request for a [flashing]

14    doorbell." (*Id.* at 23-24.) Lastly, Plaintiff argues that Defendant's requirement that the

15    deaf grandfather pay for and install his own flashing doorbell violates the FHA because

16    housing providers must provide and pay for reasonable accommodations unless doing so

17    would pose an undue burden. (*Id.* at 24.)

18            As discussed above in Section C(2)(b), the Court finds that Plaintiff timely raised

19    the doorbell theory of liability. (*See* Doc. 2 at ¶ 50). The Court also finds, for the same

20    reasons discussed above in Section C(2)(b), that a flashing doorbell would be a

21    reasonable accommodation under the FHA. Furthermore, the Court finds that a flashing

22    doorbell or equivalent accommodation is neither unduly burdensome nor a fundamental

23    alteration of Defendant's program and therefore Defendant would be required to provide

24    and pay for it. *See PGA Tour, Inc.*, 532 U.S. at 688; *see also Giebeler*, 343 F.3d at 1149.

25    However, a question of fact exists as to whether Defendant offered or provided alternate

26    reasonable accommodations that would allow a deaf individual equal enjoyment of its

27    safety check service. Thus, for the same reasons discussed in Section C(2)(b), summary

28    judgment will be denied to both parties on this issue.

Accordingly, the Motions for Summary Judgment will be granted in part and denied in part as to the FHA claim, with both Motions being denied as to the issue of the flashing doorbell, and Defendant's Motion being granted as to the issue of the ASL interpreter.

Accordingly,

**IT IS ORDERED**:

(1) Defendant's Motion for Summary Judgment (Doc. 47) is **granted in part and denied in part** as follows:

    a. Summary judgment is **denied** as to the issue of standing.

    b. Summary judgment is **granted** as to the Rehabilitation Act claim.

    c. Summary judgment is **granted** as to the Affordable Care Act claim.

    d. Summary judgment is **granted in part and denied in part** as to the Americans with Disabilities Act claim:

        i. Summary judgment is **granted** on the issue of the ASL interpreter.

        ii. Summary judgment is **denied** on the issue of the flashing doorbell accommodation.

    e. Summary judgment is **granted in part and denied in part** as to the Fair Housing Act and Arizona Fair Housing Act claims.

        i. Summary judgment is **granted** on the issue of the ASL interpreter.

        ii. Summary judgment is **denied** on the issue of the flashing doorbell accommodation.

(2) Plaintiff's Motion for Summary Judgment (Doc. 49) is **granted in part and denied in part** as follows:

    a. Summary judgment is **granted** as to the issue of standing.

    b. Summary judgment is **denied** as to the Rehabilitation Act claim.

    c. Summary judgment is **denied** as to the Affordable Care Act claim.

d.  Summary judgment is **denied** as to the Americans with Disabilities Act claim.

e.  Summary judgment is **denied** as to the Fair Housing Act and Arizona Fair Housing Act claims.

Dated this 22nd day of March, 2021.

_____
Honorable Rosemary Márquez
United States District Judge